**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**VIRGINIA A. MOSES,**

     **Plaintiff,**

**vs.**                           **CIVIL ACTION NO. 3:17-CV-01186**

**NANCY A. BERRYHILL,
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

     **Defendant.**

**<u>PROPOSED FINDINGS AND RECOMMENDATION</u>**

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. By Order entered February 6, 2017 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (Document Nos. 12 and 15.)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for judgment on the pleadings (Document No. 12.), **GRANT** Defendant's request to affirm the decision of the Commissioner (Document No. 15.); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

**<u>Procedural History</u>**

The Plaintiff, Virginia A. Moses (hereinafter referred to as "Claimant"), protectively filed her application for Title XVI benefits on December 13, 2013, alleging disability since January 1, 2007 because of "diabetes, neuropathy, hearing and vision problems, memory problems, and bladder and bowel problems".[1] (Tr. at 112, 207, 211.) Her claim was initially denied on April 14, 2014 (Tr. at 113-117.) and again upon reconsideration on May 30, 2014. (Tr. at 121-123.) Thereafter, Claimant filed a written request for hearing on June 6, 2014. (Tr. at 128-130.) An administrative hearing was held on October 2, 2015 before the Honorable Robert B. Bowling, Administrative Law Judge ("ALJ"). (Tr. at 28-58.) On October 27, 2015, the ALJ entered a decision finding Claimant had not been under a disability at any time since December 13, 2013 through the date of the decision. (Tr. at 7-27.) On December 30, 2015, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 6.) The ALJ's decision became the final decision of the Commissioner on December 7, 2016 when the Appeals Council denied Claimant's Request. (Tr. at 1-5.)

On February 4, 2017, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.) The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 9 and 10.) Subsequently, Claimant filed a Brief in Support of Judgment on the Pleadings (Document No. 12.); in response, the Commissioner filed a Brief in Support of Defendant's Decision. (Document No. 15.) Consequently, this matter is fully briefed and ready for resolution.

**<u>Claimant's Background</u>**

---

[1] In her Disability Report – Appeal, submitted on April 29, 2014, Claimant alleged that she had "been to the hospital for satic [*sic*] nerve damage in my left leg besides neuropathy pains", that she could not lift more than fifteen pounds per her doctor's instructions and that she was placed on bedrest, as well as "having more panic attacks and sleeplessness." (Tr. at 273.)

Claimant was 50 years old at the time of the ALJ's decision and considered a "person closely approaching advanced age" by the Regulations. See 20 C.F.R. § 416.963(d). (Tr. at 20.) Claimant has a high school education, having attended "basic classes", just slightly above special education classes. (Tr. at 53, 212.) Claimant had no past relevant work at the substantial gainful activity level in the last fifteen years, having stopped working at a cleaning business in 2005. (Tr. at 211.)

## Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the

Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. § 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 416.920a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning;

concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

416.920a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 416.920a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the application date of December 13, 2013. (Tr. at 12, Finding No. 1.) Under the second inquiry, the ALJ found that Claimant had the following severe impairments: depressive disorder; diabetes mellitus type II; peripheral neuropathy; and osteoarthritis. (Id., Finding No. 2.) At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 15, Finding No. 3.) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform less than a full range of medium work:

> The claimant can stand and walk for six hours in an eight-hour workday. She will require a sit/stand option on an hourly basis. She is limited to simple, routine, and repetitive tasks performed in an environment free of fast-paced production requirements involving only simple work related decisions and few, if any, work place changes. She can have only occasional interaction with the general public and coworkers, and can have only occasional supervision. (Tr. at 17, Finding No. 4.)

At step four, the ALJ found Claimant had no past relevant work. (Tr. at 20, Finding No. 5.) At the final step, the ALJ found that in addition to the immateriality of the transferability of job skills due to Claimant's lack of past relevant work, Claimant's age, education, work experience,

and RFC indicated that there were jobs that exist in significant numbers in the national economy that Claimant could perform. (Id., Finding Nos. 6-9.) Finally, the ALJ determined Claimant had not been under a disability from December 13, 2013 through the date of the decision. (Tr. at 22, Finding No. 10.)

**Claimant's Challenges to the Commissioner's Decision**

Claimant asserts several grounds in support of her appeal. First, the ALJ failed to consider the opinions of the consultative psychological and medical examiners, Penny Perdue, M.A. and Deidre Parsley, D.O., respectively, finding mental and physical limitations that contradict the ALJ's RFC assessment. (Document No. 12 at 5-6.) Next, Claimant contends the ALJ ignored the vocational expert's testimony that she would be incapable of substantial gainful activity if she was off-task more than 15% or miss more than two days per month; Claimant suffers from incontinence that would exceed workplace tolerances. (Id. at 6-7.) Claimant also argues that the ALJ failed to consider prior decisions that limited Claimant to light work, and did not explain what evidence he relied on in assessing his own RFC. (Id. at 7.) Finally, Claimant asserts that the evidence supported a finding of disability based on Medical-Vocational Guidelines Rule 201.12 because she is limited to sedentary work, not medium level work based on the medical source evidence. (Id. at 7-8.)

In sum, Claimant asks the Court to reverse the decision and award her benefits, or in the alternative, to remand this matter for further proceedings. (Id. at 9.)

In response, the Commissioner emphasizes that the ALJ appropriately considered all the medical and other evidence from the relevant period, which is only from the application date of December 13, 2013 through the decision date of October 27, 2015. (Document No. 15 at 2-3.) Claimant filed two prior applications for benefits, both of which were denied, and she did not

appeal those decisions further, therefore, the doctrine of *res judicata* barred the ALJ from

reconsidering the prior periods. See 20 C.F.R. §§ 416.1487, 416.1489. (Id. at 4, fn2.)

With respect to Claimant's argument that the ALJ improperly crafted the RFC without

considering her limitations, the Commissioner points out that the ALJ cited numerous objective

findings from the medical evidence that support the RFC assessment. (Id. at 14-15.) Further,

despite Claimant's contention that her numerous diagnoses preclude her from any work, the

Commissioner asserts that Fourth Circuit jurisprudence[3] provides that diagnoses alone does not

establish disability, and Claimant did not demonstrate any credibly established functional

limitations to contradict the ALJ's RFC assessment. (Id. at 15-16.)

The Commissioner also asserts that the ALJ properly evaluated the opinions of Ms. Perdue

and Dr. Parsley. (Id. at 16.) Regarding Ms. Perdue's opinion, the Commissioner argues that

Claimant fails to explain how the ALJ did not consider the consultative examiner's findings, and

therefore waives any argument on that issue, however, the ALJ specifically discussed Ms. Perdue's

examination and her findings in every relevant step in the sequential evaluation, and concluded

that Claimant's anxiety and panic attacks were not severe impairments. (Id. at 17.) Moreover, the

ALJ appropriately discredited Ms. Perdue's diagnosis of borderline intellectual functioning

because she deemed the test results invalid and because Claimant's education and computer use

conflicted with such a diagnosis. (Id.) The Commissioner further asserts that Claimant's argument

that the ALJ neglected Dr. Parley's opinion is the same as her argument concerning Ms. Perdue's,

however, again, the ALJ expressly considered Dr. Parsley's opinion in its entirety. (Id. at 18.) As

with Ms. Perdue's opinion, the ALJ noted that Dr. Parley's opinion did not identify any additional

---

[3] Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986).

functional limitations, and both opinions lent support for the ALJ's RFC assessment. (Id. at 18-19.)

Regarding Claimant's argument that the ALJ ignored the vocational expert's testimony that an individual being off task fifteen percent of a workday or being absent more than twice per month is unemployable, the Commissioner contends that hypothetical questions to vocational experts need only include those limitations supported by the record. (Id. at 19.) Claimant has not provided any evidence to that end, and furthermore, no physician in the record provided such an opinion that Claimant would be off task for fifteen percent of the time or would miss more than two days of work per month. (Id. at 19-20.)

The Commissioner asserts that contrary to Claimant's assertions otherwise, the ALJ did explicitly consider the prior ALJ decisions in accordance with Acquiescence Ruling (AR) 00-1(4), Albright v. Comm'r of the Soc. Sec. Admin., 174 F.3d 473 (4th Cir. 1999), and Lively v. Sec'y of Health and Human Servs., 820 F.2d 1391 (4th Cir. 1987): the prior decisions finding Claimant was not disabled and capable of light work from ALJ Chwalibog on September 22, 2010 and ALJ Hodges on September 28, 2012 were final in all respects and not binding on the present proceeding. (Id. at 20-22.) An ALJ does not have to give explicit weight to a prior decision per McKay v. Colvin, No. 3:12-cv-1601, 2013 3282928, at *13 (S.D.W. Va. June 27, 2013). (Id. at 21.) The ALJ considered the prior decisions, noted there was new and different evidence pertaining to Claimant's petition for the period from December 13, 2013 through October 27, 2015, therefore, new findings and conclusions in the present matter were warranted. (Id. at 22.)

Because substantial evidence supported the ALJ's determination that Claimant was capable of less than a full range of medium work, she would not be considered disabled under Grid Rule

201.12. (Id. at 22-23.) The Commissioner states that Claimant fails to show any medical evidence that would contradict the ALJ's findings and essentially asks the Court to reweigh the evidence. (Id. at 23-24.)

Finally, the Commissioner asserts that if the Court determines that the ALJ's decision is not supported by substantial evidence, then the proper remedy is to remand, not to reverse the decision for an outright award of benefits. (Id. at 24.) Nevertheless, in this case, the ALJ's decision is supported by substantial evidence, therefore, the decision should be affirmed. (Id. at 25.)

**The Relevant Evidence of Record**[4]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Ebenezer Medical Outreach:

Claimant treated at Ebenezer Medical Outreach from prior to the start of the relevant period in December 2012 through 2013. (Tr. at 340, 383, 390, 394.) In March 2012, she reported that she was not "being very good with her diet," and her treatment provider discussed the consequences of untreated diabetes including retinopathy and neuropathy. (Tr. at 344.) In July 2012, Claimant complained of leg pain but had no other complaints. (Tr. at 342.) In October 2012, Claimant reported left leg pain and burning. (Tr. at 340.) An examination was normal, and she was assessed with leg pain probably due to neuropathy, fatigue, and ongoing depression. (Tr. at 341.) She was educated on diabetic care, the need to monitor her sugars and take medications as prescribed, and received education on exercise and a diabetic diet. (Id.)

In January 2013, Claimant returned for a routine follow up and complained of leg pain and

---

[4] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

throbbing causing lack of sleep. (Tr. at 338.) The treatment provider noted that Claimant had not had blood work in one and a half years, and that she had lost a recent prescription for blood work. (Id.) Claimant reported that her biggest complaint was her leg pain, but that Ultram and Cymbalta helped her symptoms. (Id.) It was noted that it was unlikely that Claimant was following a good diabetic diet. (Id.) An examination was normal except for poor dentition, chronic rosacea, and mild thickening of the toe nails. (Tr. at 339.)

In April 2013, Claimant returned for a check-up and refills and reported that she was doing somewhat better with her glucose levels, but does not watch her diet, eats whatever is cooked for her at home, and walks "sometimes". (Tr. at 351.) She had no complaints, her physical and foot examinations were normal, and her glucose numbers were better. (Tr. at 351-352.)

Valley Health Associates:

Claimant began treating with Amy Marsteller, M.D. on April 16, 2014. (Tr. at 458.) During the new patient visit, Claimant reported that she was checking her diabetes at home, and that her neuropathic pain was well controlled with Tramadol and Cymbalta. (Id.) She also reported that her GERD was well controlled with Omeprazole, but reported her depression was not well controlled for several months, that she was more sad than happy. (Id.) On examination, Claimant was in no distress, and had a normal foot exam and normal bowel sounds. (Tr. at 459-460.)

Claimant returned to Dr. Marsteller in August 2014 for a follow up on her depression. (Tr. at 537.) She reported that she was enjoying the warmer weather and being outside, was taking Cymbalta regularly, and did not believe that she needed to see a therapist anymore. (Id.) She reported that she was taking her diabetes medication regularly and consuming less junk food and soda. (Id.) A physical examination was normal, a depression screen was negative, and Dr.

Marsteller noted that Claimant had benign hypertension, was doing a great job controlling her diabetes, and that her depression was well-controlled. (Tr. at 539.)

A follow up examination in January 2015 was normal. (Tr. at 533-536.) Claimant was oriented to time, place, and person, and in no distress; she had no decrease in concentrating ability; had a normal gait and stance; and had normal feet and psychological examinations. (Tr. at 535.) She returned to Dr. Marsteller in May 2015, with complaints of bladder pain and a sensation that she did not feel her bladder was emptying completely. (Tr. at 529.) On examination, Claimant was in no distress, had abdominal tenderness but no guarding, and had normal foot, neurological, and psychiatric examinations. (Tr. at 531.)

Claimant returned to Dr. Marsteller in August 2015, and reported that she had been going to physical therapy for knee pain. (Tr. at 525.) She also reported the ongoing sensation of incomplete bladder emptying, and reported that Cymbalta was helping her depression, and that her GERD was well controlled. (Id.) On examination, she was in no distress; had a normal foot examination; no decrease in concentrating ability; was oriented to time, place, and person; had a normal gait and stance; a normal affect; and no impaired thought process or content. (Tr. at 527.)

Scott Orthopedic Center:

On June 1, 2015, Claimant was examined at Scott Orthopedic Center for left knee pain she reported had started one year earlier. (Tr. at 499.) On examination, Claimant was pleasant and in no distress; oriented x 3; had a normal gait; and full range of motion in her shoulders. (Id.) An examination of her right knee revealed no effusion or erythema, neutral alignment, slight crepitance (crackling or popping sound), no patella pain, stable ligaments, an unremarkable leg examination, a normal neurological examination, and normal pedal pulses. (Tr. at 499-500.) A left

knee examination revealed normal alignment, no erythema, trace effusion, mild crepitus with motion, some tenderness over the patella but normal mobility, stable ligaments, an unremarkable leg exam, negative McMurray's sign, positive grind and inhibition signs, a normal neurological examination, and normal pedal pulses. (Tr. at 500.) X-rays revealed mild patellofemoral spurring. (Id.) Claimant was advised to try physical therapy and was given an injection in her left knee. (Id.)

Claimant returned for a follow up on August 20, 2015 and reported that her knee felt better. (Tr. at 495.) Although she was prescribed physical therapy, Claimant only went to an exercise class at a library and did not do formal physical therapy. (Id.) On examination, she was pleasant and in no distress; oriented x 3; had a normal gait; and full range of motion in her shoulders. (Id.) A right knee examination was again normal except for slight crepitance, and a left knee examination was largely normal except for mild tenderness that was improving, mild crepitus with motion, and positive grind and inhibition signs laterally. (Tr. at 496.) Conservative treatment was recommended with over the counter NSAIDS and range of motion exercises. (Id.)

Psychological Consultative Examiner:

On March 18, 2014, Claimant was examined by Penny Perdue, M.A. (Tr. at 444-448.) Claimant reported that she was applying for benefits due to neuropathy in her feet and hands, and because her legs hurt all the time and she stays tired all the time. (Tr. at 444.) She reported that she is the second of fourteen children and lived with her parents, sister, and brother; she had graduated from high school and taken classes at a business college for some time, but quit because she could not do the math. (Tr. at 445.) Claimant reported had a very limited work history, having worked one job for six months in 2005, but quit because she could not finish the job in the required amount of time. (Id.) She reported that she had depression on and off since high school, and that it had

13

been constant for a year or more. (Tr. at 444.) She also stated that she was forgetful, had anxiety since she was "a kid", was particularly anxious in big crowds, and worried that she would embarrass herself. (Id.) She reported no history of therapy or counseling, and was not receiving those services at the time of her examination. (Tr. at 445.)

A mental status examination revealed that Claimant was alert and oriented to date, place, person, and situation; had fair grooming and hygiene; unremarkable posture; a slow gait; was generally cooperative; interacted with the examiner in a limited but generally appropriate fashion; had poor eye contact; adequate verbal response; average rate of speech; normal coherence of speech; a slightly anxious mood and restricted affect; no thought process impairment; average rate of thought; appropriate content; limited insight; deficient judgment and impaired concentration based on the WAIS-IV; no suicidal or homicidal ideation; moderately deficient immediate and recent memory; and normal remote memory. (Tr. at 446.) Ms. Perdue administered the WRAT-4 and WAIS-IV and assessed Claimant with a full scale IQ of 60, but also stated that she believed Claimant's scores were not valid, and were lower than would be predicted given her educational history and current academic performance. (Id.) Ms. Perdue noted that Claimant performed a number of activities of daily living: taking her medications; washing the dishes; taking out the trash; and self-grooming. She found Claimant had mildly deficient social functioning, although noting that Claimant went to church up to two times a week, visited a cousin, and described herself as "very shy". (Tr. at 447.) Ms. Perdue noted that Claimant's pace during the evaluation was mildly slow and her persistence was mildly deficient. (Id.) She opined that Claimant would need assistance managing her funds. (Tr. at 448.)

Ms. Perdue diagnosed Claimant with depressive disorder, NOS, social phobia, anxiety

disorder, NOS, and borderline intellectual functioning. (Tr. at 447.)

Medical Consultative Examiner:

On March 25, 2014, Claimant was examined by Deidre Parsley, D.O., DDS examiner. (Tr. at 451-456.) Claimant reported that she did not use insulin and had never been hospitalized for diabetes, though she takes Glucophage and glipizide. (Tr. at 451.) She also reported that she never had hypoglycemia and did not have retinopathy, but had some numbness and pain in her feet and legs and used Cymbalta and Ultram for pain. (Id.) Claimant reported hearing loss bilaterally, but admitted that she never had an audiogram. (Tr. at 451-452.) She also reported decreased bilateral visual acuity, and indicated that she used prescription glasses that were broken. (Tr. at 452.) Claimant also stated that she had been told she has cataracts in both eyes. (Id.) She reported urine incontinence for the last seven months, but she had not mentioned this to her physicians; she also alleged rectal pain, believing it to be hemorrhoids, which had worsened in the last three years. (Id.)

On examination, Claimant's visual acuity was 20/70 in both eyes with no corrective lenses. (Tr. at 453.) She was observed to ambulate with a normal gait, did not require a handheld device, was stable at station in the supine and sitting positions. (Id.) She had fair intellectual functioning, could hear and understand conversation without difficulty, had good recent and remote memory for medical events, was alert and oriented x 3, with depressed mood and flat affect. (Id.) Her upper extremities were normal and had full rotation. (Tr. at 454.) Claimant's hands had full grip strength, full range of motion in the fingers, and she could pick up coins without difficulty. (Id.) Claimant's lower extremities revealed no tenderness, redness, warmth, swelling, fluid, laxity or crepitus, and she had 0 to 150 degree flexion in her knees, and 40 degree plantar flexion and 20 degree dorsiflexion in her ankles. (Id.) Her cervical and dorsolumbar spine had normal curvature, no

15

spasm, and no tenderness. (Tr. at 455.) Claimant could stand on one leg at a time without difficulty, bend forward to 50 degrees and laterally to 30 degrees; she had no hip joint tenderness, warmth, swelling, or crepitus, and range of flexion to 100 degrees. (Id.)

A neurological exam revealed normal muscle strength in the upper and lower extremities with no evidence of atrophy; absent sensation in left foot and decreased sensation to pinprick and light touch in the left and right legs, but normal reflexes. (Id.) Claimant was only able to take a few steps on her heels due to pain and was unable to walk on her toes, but could walk on the balls of her feet. (Id.) Dr. Parsley opined that Claimant should avoid operating cars until her eyesight could be corrected to 20/40 or better. (Tr. at 456.)

State Agency Psychological Consultants:

On March 26, 2014, Paula J. Bickham, Ph.D. reviewed the record and completed a psychiatric review technique finding that Claimant had mild restriction in her activities of daily living, and moderate restrictions in social functioning and in concentration, persistence, or pace, and no episodes of decompensation. (Tr. at 91.) Dr. Bickham also completed a mental RFC and found that Claimant had a few moderate limitations in her understanding and memory, concentration and persistence, and social interaction, but was mostly not significantly limited in those areas, and had no adaptation limitations. (Tr. at 93-94.) Dr. Bickham noted that the scores from the WAIS-IV and WRAT-4 scores administered by Ms. Perdue were invalid and that Ms. Perdue's finding that Claimant's concentration was impaired was based on invalid scores. (Tr. at 95.) Dr. Bickham ultimately opined that Claimant retained the ability to learn and perform routine, repetitive, one to three step work-like tasks with occasional interaction with the public. (Id.)

On May 28, 2014, Jim Capage, Ph.D. reviewed the record and affirmed Dr. Bickham's

analysis as written. (Tr. at 110.)

<u>State Agency Medical Consultants:</u>

On April 14, 2014, Rabah Boukhemis, M.D. reviewed the record and opined that Claimant had no exertional or non-exertional limitations. (Tr. at 92-93.) On May 28, 2014, Pedro Lo, M.D. affirmed Dr. Boukhemis' physical RFC as written. (Tr. at 107.)

<u>Adult Function Reports:</u>

In forms submitted in January and May 2014, Claimant reported that she shops in stores for food and clothing every few months; spends time with family; goes to church and to the doctor; cleans and straightens the living room; sometimes washes dishes; walks or rides in a car to get around; and can handle her financial affairs, but cannot count change because the numbers get mixed up in her head. (Tr. at 231-232, 284, 286, 287.) She also reported that she wears glasses and uses a cane, but that they are not prescribed. (Tr. at 234.)

**The Administrative Hearing**

<u>Claimant Testimony:</u>

Claimant is single, has no children, no income, and lives with her parents, who also provide her with transportation at times because she does not have a driver's license. (Tr. at 32.) Sometimes, Claimant takes the bus to get around. (<u>Id</u>.) Claimant testified that she never tried to obtain a driver's license because she is a very nervous person. (Tr. at 37.) She testified that she graduated high school and received some vocational training in computers. (Tr. at 33.) Claimant had one job working for a cleaning service in 2004 for about six or eight months and earned $242.00. (<u>Id</u>.)

Claimant testified that in a typical day she would rise around 9 a.m., sometimes she does

not sleep at night so she takes a lot of naps; she sleeps downstairs because it is too hard for her to climb the stairs all the time. (Tr. at 36, 37, 47-48.) She usually goes to bed around 9 or 10 p.m.; she does not know why she wakes up during the night, but does not take anything to help her sleep. (Tr. at 47.) Claimant testified that she cleans herself; helps her mother clean the living room; and helps with the dishes. (Tr. at 36-37.) She performs household chores such as picking up and dusting and cooks simple meals; she is able to cook a "full blown meal" if she had to, but her mom does most of the cooking. (Tr. at 50, 51.) Claimant goes to church with her mother three times a week and plays with her nieces and nephews. (Tr. at 37, 51.)

With regard to her neuropathy and diabetes, Claimant stated that she has pain in her left knee and leg and neuropathy in her right leg. (Tr. at 34.) She has had diabetes since 2007 and recently started using insulin. (Tr. at 38, 41.) She testified that the diabetic neuropathy feels like her toes burn and goes all the way up her leg into her thigh area; she is also numb. (Tr. at 39.) She has this sensation in both feet and legs and she once cut herself and did not feel it. (Id.) Claimant testified that she experiences this in both hands and it goes to her elbows; she has even had stinging in her face. (Id.) Claimant believes that her diabetes has gotten worse over the years. (Tr. at 40.)

Claimant testified that she has irritable bowel syndrome and has bladder incontinence; she has accidents two to three times each week. (Tr. at 40-41.) She also stated that she has arthritis in her knee and that she has been going to physical therapy since August, although it wears her out. (Tr. at 42-43.) She testified that she has cataracts, wears glasses, and sometimes hears roaring sounds and ringing in her ears. (Tr. at 43-44.)

Claimant feels depressed and anxious, and has taken Cymbalta for eight years and that it helps a little bit. (Tr. at 44-45.) She reported having panic attacks since she was a child, which are

brought on by arguments or when she is really upset. (Tr. at 45, 46.) She described having about two weeks' worth of anxiety attacks in the last thirty days, and they last maybe thirty or forty minutes at a time. (Tr. at 45.) She described them as causing her to become sweaty, having trouble breathing and shaking; she only takes the Cymbalta for it. (Tr. at 46.)

She also testified that she has trouble with her memory, although she does not have trouble taking her medication or tending to her personal hygiene. (Tr. at 46-47.) Claimant has trouble combing her hair because her hand gets numb and she cannot reach in the back. (Tr. at 47.) She is able to take baths and go to the toilet on her own. (Tr. at 50.)

Claimant estimated that she can walk three to four blocks before she has to stop because she is tired. (Tr. at 48.) Walking hurts her legs and feet, but especially her knee. (Id.) She does not have a cane. (Tr. at 49.) Claimant testified that she can stand for 40 minutes, but her legs start going numb, so she has to sit down. (Id.) Her knees get stiff after sitting for an hour, so she has to get up and move around or lay down. (Tr. at 49-50.) Sometimes she has difficulty sitting for the hour-long church services, and she has fallen asleep during them. (Tr. at 52.)

Claimant was unsure if she could work at a job where she would sit for two hours out of the day and walk around or stand for the other six hours, but she could not work at a job where she could sit for eight hours. (Tr. at 52-53.)

Gina Baldwin, Vocational Expert ("VE") Testimony:

The ALJ asked the VE to consider an individual of Claimant's age, education and vocational background who was capable of performing medium work that allowed for standing and walking for six hours and a sit or stand option on an hourly basis; and only simple, routine, and repetitive tasks free of fast paced production requirements and only simple work-related

decisions and only occasional interaction with the general public, with coworkers, and supervision. (Tr. at 55.) In response, the VE testified that medium work would be eliminated, but at the light work classification, such an individual was capable of performing the representative jobs of a house sitter, non-clerical office assistant, and order clerk. (Id.)

In response to questioning by Claimant's attorney, the VE testified that an individual who would need frequent and unscheduled bathroom breaks due to irritable bowel syndrome would not be able to engage in any of those occupations because the individual would be off task beyond typical tolerances. (Tr. at 56.) The VE further testified that an individual who is absent more than twice per month for any reason would be unable to maintain full time employment. (Id.)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists,

20

the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

As previously stated, Claimant argues the ALJ did not properly consider the opinions of Ms. Perdue and Dr. Parsley. (Document No. 12 at 5-6.) 20 C.F.R. § 416.927 govern the SSA's criteria for evaluating opinion evidence; per § 416.927(a)(2):

> Evidence that you submit or that we obtain may contain medical opinions. Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

The Regulations provide that an ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 416.927(c)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Under § 416.927(c)(1), more weight is given to a physician who examines a claimant than to a non-examining physician.

Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

As described *supra*, Dr. Parsley provided the consultative examination opinion evidence with respect to Claimant's physical impairments. The ALJ referenced Dr. Parsley's findings numerous times throughout the decision: first, noting that Claimant was able to hear and

understand conversational voices without difficulty during the examination (Tr. at 12, 453.); second, noting that Claimant's visual acuity was 20/70 in each eye without corrective lenses as well as small bilateral cataracts (Id.); third, noting the absence of sensation of the left foot and decreased sensation to pinprick and light touch from the lower left leg to the knee as well as the absence of sensation to pinprick and light touch from the right knee to right foot (Tr. at 14, 19, 455.); and fourth, noting that Claimant had a normal gait, intact manipulative abilities, normal motor strength in the bilateral upper and lower extremities, and no atrophy (Tr. at 15, 19, 453, 454, 455.) Though the ALJ found most of Dr. Parsley's findings were supported by the other evidence of record, which included other medial record evidence, State agency medical consultant opinion evidence and Claimant's own statements and testimony (Tr. at 19.), the ALJ only gave "little weight" to Dr. Parsley's opinion that Claimant should avoid operating heavy equipment or machinery or motor vehicles because of her eyesight because Claimant's "vision would likely be improved with use of corrective lenses." (Tr. at 20.) In sum, it is clear that the ALJ thoroughly considered Dr. Parsley's opinion, contrary to Claimant's contention otherwise.

As with Dr. Parsley, the ALJ also gave thorough review of Ms. Perdue's psychological examination findings, which included Ms. Perdue's diagnoses of social phobia and anxiety disorder, NOS based on Claimant's subjective reports, however, the ALJ compared this to Claimant's statements that she attends church services two to three times a week, grocery shops when needed, attends an exercise class at the library, and spends time with family. (Tr. at 13, 14, 230-231, 286-287, 444, 445, 447, 495.) The ALJ noted there were no mental health records or treatment records from Claimant's primary care provider, Dr. Marsteller, indicating a diagnosis of an anxiety disorder. (Tr. at 13.) With respect to Ms. Perdue's diagnosis of borderline intellectual

functioning, the ALJ noted that Ms. Perdue arrived at this diagnosis based on Claimant's self-report of having attended special education classes and having scored a full scale IQ of 60 during the examination. (Tr. at 13, 445-447.) Again, the ALJ contrasted this with Claimant's records that she was a high school graduate with average grades and that the Cabell County School records did not corroborate her allegations that she attended special education classes. (Tr. at 13, 435-437.) Further, the ALJ considered Ms. Perdue's opinion that Claimant's IQ scores were lower than predicted given her educational history, as well as Claimant's own report that she handled her own finances, read, and used a computer for family research. (Tr. at 13, 230, 286, 445-447.)

Regarding Ms. Perdue's diagnosis of depressive disorder, the ALJ noted that the record contained clinical and diagnostic evidence of depression, and that Claimant endorsed depressive symptoms during the examination. (Tr. at 13, 14.) It was further noted that Ms. Perdue found Claimant's "judgment moderately deficient and her concentration markedly impaired based on her scaled score of one on the Digit Span task" (Tr. at 14, 446.), but also that she found Claimant's pace and persistence "were mildly deficient during testing." (Tr. at 14, 447.)

In the first of the four areas of functioning, the ALJ found Claimant had moderate restriction in activities of daily living, based on Claimant's allegations as well as Ms. Perdue's observations. (Tr. at 15, 444, 447.) With regard to social functioning, the ALJ found Claimant also had moderate difficulties, again, noting Ms. Perdue's observations as well as the other evidence of record. (Tr. at 15-16, 444, 446-447.) The ALJ found Claimant had moderate difficulties with respect to concentration, persistence or pace, based on her statements supporting same, as well as on Ms. Perdue's findings. (Tr. at 16, 444, 446.) Finally, the ALJ found the record had no evidence that Claimant had any episodes of decompensation lasting for extended duration, noting that Ms.

23

Perdue also found Claimant had no history of mental health treatment or psychiatric hospitalizations. (Tr. at 16, 445.) Ultimately, when reaching the mental RFC assessment, the ALJ again repeated the findings from the record of evidence, which also included Ms. Perdue's conclusions: that Claimant could understand and follow simple instructions; and that her pace and persistence were only mildly deficient (Tr. at 20, 446-447.)

In sum, the ALJ thoroughly considered the consultative opinions of both Dr. Parsley and Ms. Perdue, having thoroughly referenced and cited the evidence of record that supported and detracted from their respective findings in accordance with the provisions outlined by the Regulations. Therefore, the undersigned **FINDS** Claimant's argument otherwise lacks merit, and the ALJ's analysis of the consultative opinions is supported by substantial evidence.

<u>Vocational Expert Testimony:</u>

Claimant contends the ALJ failed to consider the vocational expert's testimony that Claimant is incapable of substantial activity. (Document No. 12 at 6.) This argument stems from the vocational expert's responses to Claimant's attorney's queries during the administrative hearing that if an individual would require unscheduled restroom breaks several times a day due to irritable bowel syndrome, or missed two or more days per month, then the individual would not be able to maintain employment. (Tr. at 21, 56.) The ALJ gave "no weight" to Claimant's attorney's hypothetical questions "as the record does not support such limitations/restrictions", noting that Claimant received "only conservative care with prescribed Colace" and no other evidence supported a digestive impairment, and further, Claimant reported her neuropathy pain was well controlled with Tramadol and Cymbalta, having "described her knee pain as only mild at worst", and that "she has more good days than bad with use of Cymbalta." (Tr. at 21, 458, 480,

525.)

The undersigned agrees with the Commissioner that there simply was no evidence of record that supported such restrictions. See, generally, Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005) (stating that a hypothetical question is umimpeachable if it adequately reflects a residual functional capacity for which the ALJ had sufficient evidence); see also, Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989) (concluding that an ALJ's hypothetical question need only include those limitations supported by the record). (Document No. 15 at 19-20.) Accordingly, the undersigned **FINDS** the ALJ's giving no weight to Claimant's attorney's hypothetical questions and the vocational expert's responses thereto is supported by substantial evidence.

Prior RFC Assessments, *Albright*, and AR 00-1:

Claimant argues the ALJ failed to abide by Acquiescence Ruling 00-1 following the decision in Albright v. Comm'r of Soc. Sec. Admin., 174 F.3d 473 (4th Cir. 1999), when two previous ALJs both determined she was capable of only light work, not less than a full range of medium work. (Document No. 12 at 7.) In McKay v. Colvin, No. 3:12-cv-1601, 2013 WL 3282928 (S.D.W. Va. June 27, 2013), this Court determined that remand was inappropriate despite the ALJ's failure to explain the weight he gave to a prior RFC because "AR 00-1(4) requires the ALJ to consider and weigh the prior decision as evidence, but does not impose a burden on the ALJ to explicitly state the weight he assigned to this evidence." Id., at *13.

In the case at bar, the ALJ noted from the outset that Claimant received two prior denials: the former from ALJ Andrew Chwalibog on September 22, 2010; and the latter from ALJ Maria Hodges on September 28, 2012, the latter became a final decision on November 29, 2013 when the Appeals Council denied Claimant's request for review. (Tr. at 10.) The ALJ further noted that

"the current record contains new and material evidence" since ALJ Hodges determined that Claimant could perform light exertional activities on September 28, 2012, and is therefore not bound by the prior determination under <u>Lively v. Secretary of Health and Human Services</u>, 820 F.2d 1391 (4th Cir. 1987).[5] (Tr. at 19.)

The applicable Acquiescence Ruling, AR 00-1(4), provides the following:

This Ruling applies only to disability findings in cases involving claimants who reside in Maryland, North Carolina, South Carolina, Virginia or West Virginia at the time of the determination or decision on the subsequent claim at the initial, reconsideration, ALJ hearing or Appeals Council level. ***It applies only to a finding of a claimant's residual functional capacity or other finding required at a step in the sequential evaluation process*** for determining disability provided under 20 CFR 404.1520, 416.920 or 416.924, as appropriate, which was made in a final decision by an ALJ or the Appeals Council on a prior disability claim.

When adjudicating a subsequent disability claim arising under the same or a different title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence and give it appropriate weight in light of all relevant facts and circumstances. In determining the weight to be given such a prior finding, an adjudicator will consider such factors as: (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim.

Where the prior finding was about a fact which is subject to change with the passage of time, such as a claimant's residual functional capacity, or that a claimant does or does not have an impairment(s) which is severe, the likelihood that such fact has changed generally increases as the interval of time between the previously adjudicated period and the period being adjudicated increases. An adjudicator should give greater weight to such a prior finding when the previously adjudicated period is close in time to the period being adjudicated in the subsequent claim, e.g.,

---

[5] The ALJ cited Social Security Acquiescence Ruling (AR) 94-2(4), which was rescinded by AR 00-1 on January 12, 2000, in response to <u>Albright v. Commissioner of the Social Security Administration</u>, 174 F.3d 473 (4th Cir. 1999) wherein the Fourth Circuit clarified the intent of <u>Lively</u>, and concluded that AR 94-2(4) was an inaccurate statement of the <u>Lively</u> holding. <u>See</u>, <u>e.g.</u>, AR 00-1(4), 65 Fed.Reg. 1936-1, 2000 WL 43774 (Jan. 12, 2000).

a few weeks as in Lively. An adjudicator generally should give less weight to such a prior finding as the proximity of the period previously adjudicated to the period being adjudicated in the subsequent claim becomes more remote, e.g., where the relevant time period exceeds three years as in Albright. ***In determining the weight to be given such a prior finding, an adjudicator must consider all relevant facts and circumstances on a case-by-case basis.***

2000 WL 43774, at *4. (emphasis added)

In this case, the ALJ explained that he did "not find the objective evidence in the current record supports the exertional, postural, and environmental restrictions contained in the previous determination", and then listed several findings and opinions from the medical evidence of record in support. (Tr. at 19-20.) Most notable were the ALJ's recitation of several clinical findings: Dr. Parsley found Claimant had evidence of neuropathy in the lower extremities but also a normal gait and no loss of motor strength (Tr. at 19, 453, 455.); Claimant reported her neuropathy pain was well controlled with Tramadol and Cymbalta (Tr. at 19, 458.); no joint abnormalities were found (Id.); and State agency medical consultants, Drs. Boukhemis and Lo, opined "that the objective evidence did not result in severe limitations." (Tr. at 19.) Nevertheless, the ALJ also found that Claimant's diabetes, neuropathy, and left knee arthritis instantiated severe physical impairments warranting the sit/stand option on an hourly basis. (Id.)

Additionally, the ALJ acknowledged that "[t]he prior residual functional capacity noted that the claimant would be capable of simple, routine, and repetitive tasks with only occasional interaction with the public (Exhibit C1A)[6]", and further noted that both State agency psychological consultants "gave great weight to the prior finding[.]" (Tr. at 20.) Accordingly, the ALJ gave "great weight to both the prior residual functional capacity and the State agency opinions in the record, as their conclusions are well supported by the objective findings in the current record." (Id.)

---

[6] Pursuant to the Court Transcript, Exhibit C1A is ALJ Hodges September 28, 2012 decision. (Tr. at 59-75.)

In short, although the ALJ referenced a rescinded Acquiescence Ruling based on Lively, it is apparent that he did follow AR 00-1(4), noting both the objective medical evidence and subjective complaints that supported the RFC determination concerning Claimant's physical and mental impairments. Accordingly, the undersigned **FINDS** that Claimant's argument that the ALJ failed to abide by AR 00-1 and the Albright decision lacks merit, and further **FINDS** that the ALJ's analysis of the prior RFC is supported by substantial evidence.

Severe Impairments and the RFC Assessment:

Claimant argues that because of the numerous diagnoses noted by both Dr. Parsley and Ms. Perdue, she "is incapable of substantial gainful activity at any level." (Document No. 12 at 6.) A "severe" impairment is one "which significantly limits your physical or mental ability to do basic work activities." See 20 C.F.R. § 416.920(c); see also Id. § 416.921(a). "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs." Id. § 416.921(b). The Regulations provide examples of these activities: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, coworkers and usual work situations; and (6) dealing with changes in a routine work setting. Id. Contrariwise, an impairment may be considered " 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984). Moreover, a diagnosis alone does not establish disability, there must also be a showing of a related functional loss. See, e.g., Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986).

Claimant mentions her hearing, vision, bladder problems, irritable bowel syndrome, GERD, and obesity, in addition to the low scores she achieved during her examination with Ms. Perdue, all indicate she is disabled. (Document No. 12 at 5-6.) The ALJ considered these issues. With respect to Claimant's alleged hearing problem, the ALJ noted Claimant complained of bilateral hearing loss and "roaring in both ears at times." (Tr. at 12, 451.) However, the ALJ also noted that the record contained no evidence of treatment or even audiogram testing to substantiate the severity of this physical impairment. (Tr. at 12, 450.) Moreover, during Dr. Parsley's consultative examination, it was noted Claimant had no problem understanding and hearing conversational voices, and that the ALJ noticed Claimant had no issues of same during the administrative hearing. Therefore, the ALJ properly determined Claimant's hearing issue was not a severe impairment. (Tr. at 12.)

The ALJ acknowledged Dr. Parley's finding that Claimant's vision was 20/70 in each eye without corrective lenses and small bilateral cataracts (Tr. at 12, 453.) However, the ALJ also noted that Dr. Parsley believed Claimant's vision would improve with the use of corrective lenses, and that Claimant admitted during the examination that her glasses were broken. (Tr. at 12, 452.) Again, the ALJ properly determined Claimant's vision problem was not a severe impairment. (Tr. at 12.)

With respect to Claimant's alleged bladder issues, the ALJ acknowledged Claimant's statements regarding same, and that Claimant mentioned to her primary care physician, Dr. Marsteller, that she had the sensation of incomplete emptying of her bladder. (Tr. at 13, 211, 525.) However, the record contained no evidence that this issue was ever diagnosed, or that further testing was ordered, or that Claimant was referred to a specialist. (Tr. at 13.) The ALJ also noted

that Claimant mentioned to Dr. Parsley that her incontinence occurred only once every few weeks. (Tr. at 13, 456.) Accordingly, the ALJ properly determined Claimant's bladder problem was not a severe impairment. (Tr. at 13.)

The ALJ found Claimant's GERD is well controlled with the use of Omeprazole is supported by treatment records; the ALJ appropriately found this was not a severe impairment. (Tr. at 13, 525.) Claimant's body mass index readings were above 30, consistent with obesity, however, the ALJ noted Claimant's testimony that her current weight of 159 was only slightly elevated, not indicative of significant obesity, and therefore found it not a severe impairment. (Tr. at 13, 459, 495.)

As discussed *supra*, the ALJ found Claimant's anxiety and panic attacks not severe impairments due to the lack of evidence in the record supporting same. (Tr. at 13.) Likewise, the ALJ so found for Ms. Perdue's diagnosis of borderline intellectual functioning (Id.); the ALJ noted that Claimant "was not fully cooperative at her consultative examination that invalidated the results of the testing." (Tr. at 19, 446.)

Though the ALJ did not expressly find Claimant's alleged irritable bowel syndrome to be either a severe or non-severe impairment, he did acknowledge Claimant's claim of this condition, and that she complained of incontinence and having two to three accidents per week, necessitating the use of disposable undergarments. (Tr. at 18.) However, the ALJ gave "no weight" to Claimant's attorney's hypothetical question to the vocational expert regarding an individual being off task due to numerous unscheduled bathroom breaks due to irritable bowel syndrome, that "the evidence of record does not support such limitations", that Claimant only received conservative care with prescribed Colace, and that there were no other clinical findings suggesting a digestive impairment.

(Tr. at 21.)

Notably, the ALJ found that Claimant "does not have an impairment or combination of impairments equal in severity to any listed impairment, as no treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment." (Tr. at 17.) Residual functional capacity represents the *most* that an individual can do despite his limitations or restrictions. See Social Security Ruling 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite his impairments. 20 C.F.R. § 416.945(a). The RFC determination is an issue reserved to the Commissioner. See Id. § 416.927(d).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

As noted *supra*, hypothetical questions need only incorporate those limitations that an ALJ accepts as credible and that are supported by the record. See Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). The undersigned **FINDS** that Claimant's argument that the aforementioned diagnoses and/or impairments render her incapable of the RFC assessed by the ALJ lacks merit.

Application of Rule 201.12:

Claimant asserts that she "grids out" as of her fiftieth birthday as being relegated to the sedentary exertional level pursuant to Medical-Vocational Guidelines Rule 201.12. (Document

No. 12 at 7-8.) As an initial matter, the undersigned notes that there was no evidence in the underlying record that supports a finding that Claimant is limited to sedentary work, and agrees with the Commissioner that in order for this Court to find otherwise is tantamount to re-weighing the conflicting evidence, which the ALJ has the duty to resolve, not this Court. See SSR 96-8p; Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005). Claimant bears the burden of establishing a *prima facie* entitlement to benefits. See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C. § 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.") Similarly, Claimant "bears the risk of non-persuasion." Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

Nevertheless, pursuant to Rule 201.12, an individual limited to sedentary work, who is closely approaching advanced age, being 50 to 54 years old, with a high school graduate education or more which does not provide for direct entry into skilled work, and whose previous work experience is classified as "unskilled" or "none", directs that the decision find the individual "disabled." 20 C.F.R. Part 404, Subpart P, Appendix 2. However, an individual of the same background, but who is limited to light work, Rule 202.13 directs that a decision find the individual "not disabled." Id.

In this case, the ALJ determined that Claimant was capable of less than a full range of medium work because she had additional limitations, and therefore, appropriately asked the vocational expert "to determine the extent to which these limitations erode the unskilled medium occupational base." (Tr. at 21.) Given the factors provided by the ALJ, the vocational expert opined that an individual such as Claimant could "perform the requirements of unskilled work at the light

exertional level." (<u>Id</u>.) Having further opined that the responses complied with the Dictionary of Occupational Titles, the ALJ properly concluded that the finding "not disabled" was therefore appropriate under the framework of the Medical-Vocational Guidelines. (Tr. at 21-22.)

In accordance with this Court's duty to scrutinize the record as a whole in order to determine if the Commissioner's conclusions were rational, as noted *supra*, the undersigned **FINDS** that the ALJ's consideration of and resolution of Claimant's limitations and abilities were "rational" and based upon substantial evidence. <u>Oppenheim v. Finch</u>, 495 F.2d at 397. The undersigned further **FINDS** that the ALJ's decision finding Claimant was not disabled is supported by substantial evidence.

## <u>Recommendations for Disposition</u>

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for reversal or remand as articulated in her Brief in Support of Judgment on the Pleadings (Document No. 12.), **GRANT** the Defendant's request to affirm the decision below as articulated in its Brief in Support of Judgment on the Pleadings (Document No. 15.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings

and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: July 20, 2017.

Omar J. Aboulhosn
United States Magistrate Judge